MAX WEITZ and SYLVIA WEITZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weitz v. Commissioner
Docket No. 24031-85.
United States Tax Court
T.C. Memo 1989-99; 1989 Tax Ct. Memo LEXIS 99; 56 T.C.M. (CCH) 1422; T.C.M. (RIA) 89099; March 13, 1989; As amended March 29, 1989 Harvey R. Poe, for the petitioners. William S. Garofalo, and C. Ellen Pilsecker for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND *100 OPINION WRIGHT, Judge: By a notice of deficiency dated April 15, 1985, respondent determined a deficiency in petitioners' Federal income tax for taxable year 1981 in the amount of $ 10,863 and an addition to tax under section 6653(a) [1] in the amount of $ 543.15. The issues for decision are (1) whether petitioners properly claimed a deduction for the value of medical equipment donated to a hospital, and (2) if such deduction is not proper, whether petitioners are liable for an addition to tax pursuant to section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioners Max and Sylvia Weitz (petitioners) were married and resided in Fort Lee, New Jersey, at the time of filing the joint petition herein. Petitioners, cash basis taxpayers using a calendar year, timely filed their joint return for the taxable year 1981 with *101 the Internal Revenue Service Center in Holtsville, New York. In July 1981, petitioners donated several items of medical equipment to West Hudson Hospital (West Hudson or the hospital). Petitioners made this donation after a discussion with Donald J. Saltzman (Saltzman), their accountant. Saltzman, a certified public accountant since 1964, was associated with the New Jersey accounting firm of Albano, Leaf, Saltzman, Pfeil, Maeder and Company (Albano), and provided accounting services to petitioners through the year in issue. Saltzman introduced petitioners to a plan he had devised in conjunction with Barry Adler (Adler), a longtime client. Saltzman and Adler proposed that petitioners purchase medical equipment at discount prices and donate it to charitable institutions. Adler was in the business of buying and selling medical equipment and supplies. From 1962 to 1972, Adler was the president of Leed's Surgical Supply Company, a provisioner of surgical and medical supplies. In 1981, he was the president of Leed's Financial Advisory Service (Leed's), a consulting firm, and the president of Monsey Medical Holding Company, a management company for gynecology and breast cancer detection *102 centers. Both of these businesses purchased and distributed medical supplies and equipment. In the course of business, Adler frequently purchased medical equipment at bankruptcy auctions for prices far lower than usual retail prices. Because items sold at hospital bankruptcy auctions were generally sold without reserve, the auctioneer was compelled to accept the highest bid, regardless of whether the bid approximated real value. Adler anticipated a discount of up to 90 percent of fair market value on equipment and supplies purchased at a bankruptcy auction. Some time prior to the year in issue, Adler approached Saltzman, his accountant, with a proposal for a tax sheltering investment plan whereby Adler would purchase medical equipment at bankruptcy auctions on behalf of Albano clients selected by Saltzman (the investors). The plan provided that each investor would contribute to a pool of funds which would be used to purchase medical equipment. After holding the equipment for more than one year, the investors would then donate it to designated charitable institutions. Each investor would claim a deduction in amounts of the equipment's fair market value at the time of contribution. *103 After paying his proportionate share of the purchase price and a ten percent commission to Adler, each investor was advised to expect a return on his investment at a ratio of four to one. Saltzman and his partners approved the plan and they solicited investors from among their own clients, particularly those who would benefit significantly from the tax deductions. The solicited investments ranged in amount from $ 500 to $ 2,000. [2]
When they subscribed, the investors knew that the equipment would be donated in their names to one of two hospitals, Pan-American Development Foundation (Pan-American Development) or West Hudson Hospital (West Hudson), although they did not know which one. Pan-American Development was an American institution which distributed medical, agricultural and advanced technological equipment to needy areas in Latin America and the Caribbean. West Hudson was a private hospital *104 in Kearny, New Jersey. Both Pan-American Development and West Hudson are tax-exempt charitable organizations. In July 1980, Adler learned of a bankruptcy auction at Yonkers Professional Hospital (Yonkers) from a newspaper advertisement. [3] Adler decided to attend the auction and purchase equipment on behalf of a group of investors which included petitioners. In anticipation of the auction Adler attended a preview (the preview) of the supplies and equipment to be auctioned. Adler was accompanied at the preview by Richard Sanderman (Sanderman), the Director of Finance at West Hudson, who prepared the hospital's budget and managed all of its funds among other duties. Sanderman also was in charge of purchasing the hospital's new medical equipment, and was authorized to execute binding contracts on the hospital's behalf. In fact, Sanderman's association with Adler stemmed from attending many of the same bankruptcy auctions. *105 Just prior to the year in issue, West Hudson was building a new wing to contain a 46-bed skilled nursing facility. In addition, the hospital was adding a new radiology department, new operating and recovery rooms, and 50 or 60 new beds to the hospital itself. The construction was expected to continue from 1980 through 1984 although the new wing was to be completed by December of 1982. Because West Hudson needed a wide variety of equipment to furnish and outfit the new facilities, Sanderman took several heads of departments at the hospital with him to the Yonkers preview to choose the equipment that Adler would buy and donate to the hospital. Sanderman then informed Adler of the selected equipment. On July 14, 1980, Adler and Sanderman attended the Yonkers auction together, and Adler purchased much of the medical equipment selected by the department heads. Throughout this time, both Adler and Sanderman understood that Adler was acting as agent of the investors and was not representing West Hudson. At the auction Adler purchased several lots of medical equipment. Within one week of the auction, Adler arranged for a portion of the purchased equipment to be transported at West *106 Hudson's expense to a warehouse rented by the hospital for $ 400 per month. The warehouse contained supplies and stored equipment for the hospital and was staffed by West Hudson personnel. Adler and Sanderman agreed that title to the donated equipment would not pass from the investors to West Hudson until July 15, 1981, a year and a day after the date of the auction. The remainder of the equipment purchased by Adler at the Yonkers auction was shipped to Pan-American Development. In response to Adler's written request for payment of a commission for his services, petitioners issued two checks on February 2, 1981, payable to Leed's, Adler's business in the total amount of $ 2,000. The donated equipment was stored in one corner of the warehouse rented by West Hudson. It was not physically separated by barrier or wall from the rest of the stored goods. Pursuant to his verbal agreement with Adler, Sanderman issued orders to the storeroom manager that the equipment in the warehouse brought from the Yonkers auction was not to be used by the hospital for a period of at least a year. The donated equipment was inventoried upon arrival at the warehouse and remained there until November *107 of 1982 when it was moved to the newly constructed wing. Sanderman arranged for the donated equipment to be appraised within a few months after its arrival at the warehouse, and it was reappraised in July of 1981. West Hudson paid for insurance coverage for all of the warehouse's contents, including the donated equipment. While the donated equipment was stored in the warehouse it was generally undisturbed by West Hudson personnel. Despite Sanderman's orders to his employees that the donated equipment was not to be used, on at least one occasion John Ramones (Ramones), the storeroom manager at the warehouse during the year in issue, might have used a hospital bed from the donated equipment. Although he was not sure, Ramones believed that he might have placed one of the beds in service on one of the hospital wards as a temporary substitute for one of the ward's regular beds which had broken. If one of the donated beds was used, it would have only been for the time necessary to repair the broken bed and then the donated bed would have been put back with the other donated equipment, which was not used until after July 15, 1981. Petitioners received a letter from Sanderman dated *108 July 28, 1981, which thanked them for their donation and acknowledged receipt of 13 Hill-Rom electric beds with siderails (the donated beds), valued as a group in the amount of $ 20,371. The parties agree, however, that the beds had an actual appraised value in the amount of $ 16,806 as of July 28, 1981. The letter was the first notice petitioners had of exactly what items of equipment had been donated to West Hudson on their behalf. Sanderman wrote similar letters to all the other investors, acknowledging receipt of various items of equipment. These letters were prepared according to a list sent by Adler which allocated the various items of equipment among the investors in proportion to their initial cash expenditures. Simultaneously, an entry was made in the hospital's ledger for the donated beds, although the beds were not actually placed in service until the new wing was finished in December 1981. On their Federal income tax return for taxable year 1981, petitioners claimed a charitable contribution deduction for a donation of the 13 Hill-Rom beds to West Hudson hospital in the amount of $ 20,371. The first issue for our consideration is whether petitioners properly claimed *109 a deduction for a charitable contribution in the taxable year 1981. In general, section 170 allows a deduction for a charitable contribution made within the taxable year. In order to be deductible, the contribution must be made to or for the use of an organization described in section 170(c). The parties agree that West Hudson Hospital is such an organization. Where a taxpayer makes a contribution in property rather than cash, the amount of the charitable contribution deduction is generally the fair market value of the property at the time of the contribution. Sec. 170A-1(c)(1), Income Tax Regs. However, the amount of any charitable contribution of property otherwise allowable is reduced by any gain which would not have been long-term capital gain recognizable if the taxpayer had sold rather than contributed the property. Sec. 170(e)(1)(A). During the year in issue, the holding period for long-term capital gain was one year. Sec. 1222. Respondent contends that petitioner failed to make a charitable contribution to West Hudson during the year in issue because the various transactions, culminating with the donation of the medical equipment, lacked economic substance. Respondent *110 asserts that the economic reality of petitioners' purchase and contribution of the equipment amounted to nothing more than a convoluted plan to provide West Hudson with needed equipment at minimal cost and petitioners with a tax deduction at a ratio of four dollars of deduction for each dollar of investment capital. Respondent further contends that even if the transactions have economic substance, the donated property was not long term capital gain property in the hands of the donor because West Hudson became the true owner of the donated property as soon as it was placed in the warehouse, and therefore, the equipment was not held by petitioners for a period of at least one year prior to contribution. Therefore, the amount of petitioners' charitable contribution would be reduced by the amount of ordinary gain petitioners would have realized had they sold the equipment. Petitioners counter that the economic substance of their contribution of medical equipment to West Hudson reflects the form of the transactions. Petitioners maintain that Adler acted exclusively as their agent in purchasing the equipment and arranging for the storage, and that, therefore, as the principals, they *111 were the true owners of the donated equipment. Petitioners contend that they owned the equipment for more than one full year, and that if they had sold it, they would have realized long-term capital gain. It is well settled that the economic substance of a transaction, rather than its form, will govern whether the transaction is bona fide for income tax purposes. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1236 (1981). "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering,293 U.S. 465, 469 (1935). However, "[a] given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938). The determination of the true substance of a transaction involves an examination of all the facts and circumstances. Petitioners bear the burden of proving that they made a charitable contribution to West Hudson during the year in issue. Welch v. Helvering,290 U.S. 111 (1933). *112 Respondent's first challenge to the economic substance of petitioners' transactions, is that petitioners failed to make a completed gift because they lacked donative intent. In order to constitute a charitable contribution within the meaning of section 170 petitioners must have made an inter vivos gift to the donee. Seed v. Commissioner,57 T.C. 265, 275 (1971); DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). As we noted in Guest v. Commissioner,77 T.C. 9, 16 (1981), citing Weil v. Commissioner,31 B.T.A. 899 (1934), affd. 82 F.2d 561 (5th Cir. 1936), cert. denied 299 U.S. 552 (1936), the elements of an inter vivos gift are: (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of title, dominion and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can *113 exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee * * * [31 B.T.A. at 906]. 77 T.C. at 16. We must consider whether the transfer was made "in expectation of the receipt of certain specific direct economic benefits within the power of the recipient to bestow directly or indirectly, which otherwise might not be forthcoming." Stubbs v. United States,428 F.2d 885, 887 (9th Cir. 1970), cert. denied 400 U.S. 1009 (1971); Pettit v. Commissioner,61 T.C. 634, 639 (1974). In order to establish that the transfer of hospital equipment to West Hudson was a charitable donation, petitioners must establish that they were motivated by "detached and disinterested generosity." Commissioner v. Duberstein,363 U.S. 278 (1960); Foster v. Commissioner,80 T.C. 34, 222 (1983), vacated in part on other grounds 756 F.2d 1430 (9th Cir. 1985), cert. denied 474 U.S. 1055 (1986). In determining *114 the existence of a charitable contribution, we examine the true nature of the transaction. Zmuda v. Commissioner,79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Grinslade v. Commissioner,59 T.C. 566 (1973). Respondent argues that petitioners' primary motivation in transferring the medical equipment to West Hudson was to secure a tax deduction, and that, therefore, petitioners lacked donative intent. In support of this contention, respondent notes that petitioners did not know which specific items of equipment would be purchased or which hospital would eventually receive them. Furthermore, respondent points out that Adler bid only on equipment which was selected by West Hudson employees before the auction. Most of respondent's argument that petitioners lacked generous and altruistic donative intent is irrelevant and ill conceived. A charitable contribution may be motivated by the basest and most selfish of purposes as long as the donor does not reasonably anticipate benefit from the donee in return. See, e.g., Stubbs v. United States, supra.Although respondent makes much of the fact that West Hudson *115 personnel chose the equipment which would be donated, there is no requirement that the donated property be unnecessary or useless to the donee. The record does not suggest that petitioners anticipated any benefit from West Hudson, the donee, in exchange for, or in response to, their contribution. Although we are not unmindful of the tax benefits petitioners received from the contribution, that is not pertinent to an analysis of donative intent. We conclude that petitioners' primary motivation in making the contribution was to donate equipment to the hospital without the expectation of any consideration from the donee, and that, therefore, petitioners were motivated by the intent needed to accomplish a charitable donation. Turning to respondent's second and more significant argument, we must consider whether the entire series of transactions lacked economic substance. In order to have economic substance, the form of a transaction or series of transactions must comport with the underlying reality. Skripak v. Commissioner,84 T.C. 285, 315 (1985). The fundamental inquiry is "whether what was done, apart from the tax motive, was the thing which the statute intended. *116 " Gregory v. Helvering, supra at 469. See also Goldstein v. Commissioner,89 T.C. 535 (1987); Dolese v. Commissioner,82 T.C. 830 (1984), affd. 811 F.2d 543 (10th Cir. 1987). In form, at least, Adler purchased the medical equipment at the Yonkers auction on behalf of petitioners and the other investors and arranged for it to be stored for a period of more than one year. After more than one year, title to the donated equipment passed to West Hudson, a qualified charitable organization providing West Hudson with necessary equipment. However, we must determine whether, in substance, the donated equipment was actually purchased on behalf of petitioners and whether petitioners continued to own the property until the date upon which they claim to have donated it. Neither party contends either that the equipment did not really exist or that it was not actually surrendered to West Hudson's complete dominion and control by July 28, 1981, more than one year after the purchase. The sole issue in dispute is whether petitioners and the other investors were, in fact, the owners of the donated equipment from the time of purchase *117 until the time of contribution. Respondent maintains that the economic substance of the various transactions, considered as a whole, indicates that, in reality, Adler represented West Hudson, and not petitioners and the other investors, when he purchased the equipment at the Yonkers auction. In support of this position, respondent notes that Adler had been in the business of buying and selling hospital equipment for some time prior to the Yonkers auction and was already acquainted with Sanderman. Adler bid only on the lots that Sanderman and his staff selected before the auction. In contrast, petitioners and the other investors did not know what equipment would be purchased, where it would be stored, or to whom it would ultimately be donated. Respondent urges us to conclude that Adler was really acting on West Hudson's behalf when he purchased the donated equipment at the Yonkers auction. A charitable contribution may be accomplished through the efforts of an agent acting for the donor. Greer v. Commissioner,70 T.C. 294, 304 (1978), affd. on other grounds in an unpublished opinion 634 F.2d 1044 (6th Cir. 1980); Broussard v. Commissioner,16 T.C. 23, 27 (1951). *118 An agency relationship is established by the mutual agreement of the principal and the agent. Senor v. Bangor Mills, Inc.,211 F.2d 685 (3d Cir. 1954). Based on the uncontroverted evidence contained in the record, we conclude that Adler was, in fact, representing petitioners and the other investors as their agent throughout the transactions in issue here. Petitioners and the other investors authorized Adler to select and buy medical equipment which would be appropriate for donation to a hospital from a bankruptcy sale. Rather than specifying particular items of equipment, they authorized Adler to select suitable equipment relying on his own judgment as an experienced trader in medical equipment. Adler was further authorized to spend a specific limited amount of money and to arrange for safe and convenient storage for a year. Finally, Adler was instructed to choose a hospital which would welcome a donation of the medical equipment. In sum, Adler was specifically authorized to choose, purchase, transport and store the donated equipment in such a way as to bring the entire transaction within the requirements of the definition of a deductible charitable contribution *119 of appreciated property. The record establishes that Adler did, in fact, comply with those instructions and that West Hudson received valuable and needed medical equipment at no cost to itself. Respondent next challenges whether petitioners were the true owners of the donated equipment throughout the year during which it was stored in West Hudson's warehouse. Respondent contends that title to the donated medical equipment passed to West Hudson immediately upon its arrival at West Hudson's warehouse. Respondent contends that because West Hudson enjoyed uninterrupted physical possession and control over the donated equipment, then, in fact, if not in form, West Hudson was the owner of the donated equipment from the time it arrived in the warehouse. [4]
*120 It is well established that a sale or transfer of goods is not complete unless the parties intend an immediate transfer of ownership. Lott v. Delmar,66 A.2d 25 (N.J. 1949). Ownership is established not by bare legal title but by all of the benefits and burdens of ownership, including the unexercised right to beneficial enjoyment of the property. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981); Yelencsics v. Commissioner,74 T.C. 1513, 1527 (1980). The fact that the property is never in the physical possession of the owner does not prevent him from enjoying the rights and privileges of ownership. Skripak v. Commissioner, supra at 316. Some of the indications of ownership include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears *121 the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. 77 T.C. at 1221, 1237 (citations omitted). We conclude that petitioners and the other investors were the owners of the donated equipment throughout the time that it was stored in the West Hudson warehouse until the time when receipt was acknowledged. All of the parties to the transaction intended for all of the rights and privileges of ownership, with the exception of possession, to belong completely and indisputably to the investors. The evidence establishes that the beneficial rights to the property belonged to petitioners and the other investors. The equipment was purchased on their behalf by their authorized agent and was stored temporarily in the warehouse for their convenience until such time as title passed to West Hudson. Adler testified without contradiction that if petitioners or one of the other investors had requested to withdraw from the plan and take possession of his share of the equipment his request would have been honored. Adler, Saltzman and Sanderman all testified that they consistently treated the equipment *122 as if it belonged to the investors. Adler and Sanderman testified that the equipment was kept separately from the rest of the contents of the warehouse and orders were given that it was not supposed to be touched until such time as it was transported to the rooms of the new wing. West Hudson kept a separate inventory for the donated equipment in the warehouse. The donated equipment was not listed on West Hudson's regular inventory until after the letters were sent to the donors. Sanderman testified that he believed that the equipment did not belong to West Hudson until he sent letters to petitioners and the other investors acknowledging the contribution. The employees of West Hudson were instructed to stay away from the donated equipment which was kept separately in a corner. Because Ramones' testimony at trial was vague and ambivalent, we can only conclude that Sanderman's instructions might have been disobeyed and one of the donated beds temporarily was placed in service on at least one occasion. However, the weight of the evidence establishes that the use was unauthorized and in direct contradiction and disobedience to directions. Respondent argues that under New Jersey law, *123 title passed to West Hudson when the equipment arrived at the warehouse. Respondent contends that the lack of a binding agreement between Adler and Sanderman which would protect the rights of the investors and the absence of any documents of title or warehouse receipts show that title passed to West Hudson upon delivery. However, the statutes upon which respondent relies to establish this proposition pertain to sales of goods rather than to gifts and are thus inapplicable. With respect to a gift petitioners must establish the existence of an intent to give and delivery. Although delivery was accomplished within a week after the Yonkers auction, the intent to give was deliberately not formalized, nor did title pass, until after more than one year had passed. The record establishes that the requisite elements of a charitable contribution did not appear before July 28, 1981. Underlying each of respondent's arguments is concern over the significant tax savings petitioners hoped to obtain as a result of their participation in the plan devised by Adler and Saltzman. Petitioners and the other investors paid a relatively low price for the equipment which, at no cost or inconvenience *124 to themselves, they stored for one year until they could donate it to West Hudson and claim a charitable contribution deduction in an amount four times greater than their cash outlay. Nonetheless, petitioners actions complied in every respect with statutory requirements. As we recently noted in Skripak v. Commissioner, supra, section 170 allows a deduction from tax with respect to donations to charitable institutions even when the donation is carefully contrived to comply with the requirements of the applicable rules and regulations. 84 T.C. at 319-320. Petitioners' actions have been planned and executed to assure that their donation of medical equipment to West Hudson would come within the definition of a deductible charitable contribution and all of the steps necessary to accomplish that goal have been effectuated. Petitioners cannot be penalized for being careful. Although we conclude that petitioners are entitled to claim a deduction for the charitable contribution to West Hudson, we cannot find that the deduction should be computed using a fair market value of $ 20,371. Petitioners offered no support for that figure nor did they explain why *125 it had been chosen by Sanderman. Although both parties have agreed through stipulation that the fair market value of the donated medical equipment was $ 16,806 at the time of contribution we find that their agreement is not dispostive of this first issue. In determining the fair market value of an item it is necessary to define the appropriate market through an examination of the facts and circumstances. Lio v. Commissioner,85 T.C. 56, 68 (1985), affd. sub nom. Orth v. Commissioner,813 F.2d 837 (7th Cir. 1987); Anselmo v. Commissioner,80 T.C. 872, 882 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Identifying the proper market depends on identifying the buyer's and donee's normal course of trading for the donated goods. Lio v. Commissioner, supra at 69-70. In this case West Hudson, the donee hospital, frequently purchased items similar to the donated goods at bankruptcy sales. The record establishes that Sanderman frequently attended bankruptcy auctions to buy West Hudson's supplies and equipment most economically. Indeed, Adler and Sanderman met each other at a bankruptcy auction. As a consumer *126 of used hospital supplies and equipment, Sanderman often turned to bankruptcy auctions rather than the resale market if he needed equipment like the donated beds. We believe he would have bought equipment for West Hudson similar to the donated equipment at a bankruptcy auction. There was no indication in the record that Sanderman would have purchased equipment similar to the donated goods on the resale market. Furthermore, there is no evidence that petitioners bought the medical equipment for resale on the used equipment market. To the contrary, they bought the equipment specifically to donate it to a medical facility. Consequently, the fair market value in the resale market is irrelevant to the case before us. We conclude that the fair market value from the relevant and appropriate bankruptcy auction market would have been $ 2,000, or the price of the equipment to petitioner. The final issue for our consideration is whether petitioners are liable for additions to tax under section 6653(a) with respect to the portion of respondent's determination of deficiency which we have sustained. Section 6653(a) provides for an addition to tax if any part of the underpayment of tax is due *127 to negligent or intentional disregard of the rules or regulations. Petitioners bear the burden of proving that the additions to tax determined by respondent should not be sustained. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Negligence under section 6653(a)(1) is defined as lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). In claiming a deduction for a charitable contribution in the amount of $ 20,371 petitioners relied on the letter they received from West Hudson acknowledging their contribution. That figure was approximately ten times the amount of their initial cash investment as they had been advised to expect. A reasonable person would have suspected that the transformation of $ 2,000 capital outlay into $ 20,000 in deductions without any effort or involvement on his part was too good to be true. Furthermore, petitioners relied on the advise of their accountant who was himself involved with the promotion of the plan. Petitioners should have contacted someone who was not involved for unbiased counsel. Therefore, we conclude *128 that petitioners' underpayment in tax was due to negligent or intentional disregard of the rules and regulations and that respondent's determination of an addition to tax must be upheld. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The arrangement between Adler and Saltzman continued for several years after the year in issue. From 1980 to 1983, Adler and Saltzman arranged donations of medical equipment with a total value of between $ 3 and $ 4 million dollars to Pan-American Development and West Hudson.↩
3. Respondent introduced considerable evidence that the plan devised by Adler and Saltzman was put into practice well before the year in issue. Apparently, Saltzman and Adler had arranged for the donation of medical equipment to the Pan-American Development Foundation for some time prior to the year in issue. However, all the evidence pertaining to donations to Pan-American is irrelevant to this proceeding because the sole issue before us is petitioners' donation of medical equipment to West Hudson in the taxable year 1981.↩
4. In the alternative, respondent argues that if we conclude that petitioners were the true owners of the donated equipment throughout the time it was stored at West Hudson's warehouse until July 15, 1981, that we subtract from the fair market value of the donated equipment a sum representing the fair rental value of the warehouse space and the cost of transporting the donated equipment to the warehouse. In support of this argument, respondent introduced an invoice representing the total monthly rental cost of the warehouse. However, respondent has failed to show the proportion of that rental fee which ought to be allocated to the donated equipment and has not introduced evidence of the cost of transporting the donated equipment to the warehouse. In light of the paucity of evidence in the record or discussion on brief, we conclude that neither party considers this issue worthy of our attention.↩