**SENOR**

v.

**BANGOR MILLS, Inc.**

No. 11104.

United States Court of Appeals Third Circuit.

Argued Dec. 11, 1953.

Decided March 18, 1954.

Rehearing Denied April 7, 1954.

Marshall H. Morgan, Philadelphia, Pa., for appellant.

Morris Wolf, Philadelphia, Pa., New York City (Isidor J. Kresel, Harold I. Meyerson, New York City, Kresel & Meyerson, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, on the brief), for appellee.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is a diversity case presenting a Pennsylvania controversy between a seller of certain goods and a purchaser of the same goods who did not deal with each other, but rather with a third person as a result of whose improper conduct and financial irresponsibility one of the present parties must bear a loss. The district court found that the defendant buyer was not liable to the plaintiff seller either for goods bought and sold or on a check given to the seller by the wrongdoer. The plaintiff has appealed.

These are the facts. At the time in question the demand for nylon yarn exceeded the supply which the sole producer of such yarn allocated among the members of the trade. This shortage had led to the development of a so-called "secondary" market in which some of those who purchased from the manufacturer resold yarn at a profit rather than using it themselves. Plaintiff Senor was such a seller. Defendant Bangor Mills, a very large user of nylon yarn in the manufacture of tricot, was able to maintain its production level only by frequent substantial purchases in the "secondary" market. But its known needs and economic position were such that it was asked to pay prices that were very high even for that market. Accordingly, it sought to get yarn cheaper through an intermediary.

Beginning in January 1951, Bangor utilized William Shetzline as such an intermediary. The district court found that Shetzline "was, among other things, a hosiery jobber * * * in practical control * * * of two manufacturing concerns, River Lane and H & S, * * * He also had or was supposed to have contacts with various other manufacturers, which put him in a position to obtain their surplus yarn". However, Shetzline had no substantial credit of his own and thus had to make most of his purchases in the "secondary" market for cash. To enable him to proceed in this way in its interest Bangor established an account in the Peoples Bank of Langhorne, Pennsylvania in both its name and Shetzline's, upon which Shetzline could draw without using Bangor's name. As to the actual purchase of yarn, the district court found that the agreement between Bangor and Shetzline was as follows:

"Shetzline had no authority to buy any yarn at all for Bangor, except as specified and agreed to from time to time by Bangor. Originally, each time that he was able to purchase yarn he had to get in touch with Bangor and advise it of the quantity and the price and get its consent;

otherwise there would be no sale. Later on, Bangor, in effect, gave its consent in advance by telling Shetzline how much yarn it would buy and at what price, but Shetzline had no more authority to buy more than the amount specified or to pay more than the price fixed than he had before."

The record further shows, and it is not disputed, that under this arrangement at the time of the transactions here in dispute Bangor had stipulated that Shetzline was not to buy yarn for Bangor at a price exceeding $10 per pound and that his purchases for its account should not exceed the unobligated balance in the bank account which Bangor had placed at his disposal. At the same time, again in the language of the district court, "Shetzline was under no obligation to buy any yarn at all for Bangor. He was entirely free to purchase as much as he wanted on his own account and sell it to manufacturers other than Bangor, or if he wished he could use it in his own manufacturing business". The record also shows that when Shetzline did supply yarn to Bangor he was not required to reveal the source.

With the foregoing arrangement in effect, Shetzline purchased yarn from many persons, paying for it out of the above described account and forwarding the yarn, after he received it, to Bangor. As to the particular transaction in suit the district court found:

"On June 19 Shetzline bought about 1250 pounds of nylon yarn from the plaintiff at $11.35 a pound and directed him to ship the yarn to River Lane, one of Shetzline's corporations, to whom Senor had shipped and billed goods on a number of prior occasions. The plaintiff sent the yarn as directed and [on June 29] received a check signed by Shetzline drawn, * * * upon the * * * account in the Peoples Bank. The yarn was delivered at Shetzline's place of business and was invoiced by Shetzline to Henry Mills [a dummy corporation for Bangor] at $10.-

00 a pound, but was delivered by him directly to Bangor. The check was returned unpaid because of insufficient funds.

"The plaintiff knew nothing whatever of any relationship between Shetzline and Bangor. He intended to sell the yarn to River Lane, understood that River Lane was the buyer and made the sale entirely upon the credit of River Lane."

■ On all the facts one of the district court's conclusions was that "The result [of the arrangement between Shetzline and Bangor] was that a separate agency was created each time Shetzline bought yarn with Bangor's money". As we see it, this conclusion is both correct and in the present circumstances decisive against plaintiff on its claim against Bangor for goods sold and delivered.

■ It is axiomatic that the existence of an agency relationship and, in large measure, the area it covers are determined by whatever agreement the parties have made as to the circumstances under which the agent may and will act for the principal. In this case the district court quite properly found that Shetzline had not undertaken to buy any yarn at all for Bangor. He was free to buy for others or for himself and to disregard Bangor's needs entirely. He did not go into the market subject to an agent's fundamental undertaking and fiduciary obligation to act primarily in the interest of his principal. It was not until Shetzline actually made a particular purchase such as Bangor had agreed to accept and, by using Bangor's money to pay for it or in some other proper way, indicated the appropriation of that acquisition to Bangor's account, that Shetzline came under any obligation to Bangor. The purchase in this case made on Shetzline's credit at a price prohibited by Bangor was not within the terms of the agency. There is nothing in the record to suggest any duty of Shetzline, after the goods were delivered to him, to appropriate and redirect them to Bangor. The goods as received by Shetzline belonged to him and he was free to keep them or dispose of them to whomever he would and could.

■■ Therefore Bangor cannot be liable as a principal on Shetzline's purchase unless some special doctrine of apparent authority, estoppel or something akin to fraud extends Bangor's responsibility beyond the agreed limits of Shetzline's agency. The only such rule which suggests itself as possibly applicable appears in Section 195 of the Agency Restatement:

"An undisclosed principal who entrusts an agent with the management of his business is subject to liability to third persons with whom the agent enters into transactions usual in such businesses and on the principal's account, although contrary to the directions of the principal."

The typical application of this rule is to a going concern with an established place of business and obvious assets operated by one who ostensibly is the proprietor but secretly is agent for an undisclosed principal. McCracken v. Hamburger, 1890, 139 Pa. 326, 20 A. 1051; Hubbard v. Tenbrook, 1889, 124 Pa. 291, 16 A. 817, 2 L.R.A. 823; Brooks v. Shaw, 1908, 197 Mass. 376, 84 N.E. 110; Watteau v. Fenwick, 1892, 1 Q.B. 346. In such cases liability is imposed upon the undisclosed principal because he has placed the agent in such apparent relationship to an observable enterprise as is likely to induce reliance upon him as a responsible proprietor. But there is no rational or equitable basis for such a doctrine unless the person dealing with the agent finds him in charge of a "business" in this sense of a functioning enterprise with observable assets. Obviously Bangor has not put Shetzline in any such deceptive situation of apparent proprietorship of a "business". Section 195 of the Restatement is not applicable to the facts of this case.

■ Beyond this, plaintiff has urged that we consider other doctrines enlarg-

ing the power of an agent to bind a partially disclosed principal beyond his actual authority, although such rules admittedly have no application to an undisclosed principal. But the contention that Bangor was partially disclosed misconceives the character of a partially disclosed principal. Senor thought Shetzline was the real and sole party in interest as purchaser, acquiring goods for his own personally controlled business carried on in corporate form under the River Lane name. There was no suggestion that behind Shetzline there stood any unidentified independent personality whose credit and responsibility backed the Shetzline purchase. Without such an understanding there can be no case of a partially disclosed principal.

Neither is the plaintiff's case improved by the fact that Bangor accepted the yarn from Shetzline and presumably used it in its own business. For Bangor already had supplied Shetzline with more than sufficient funds to pay for this quantity of yarn with the understanding that Shetzline would pay cash for any goods purchased on Bangor's account. Whatever Shetzline actually did with the money, Bangor having thus fully settled with him in advance, the delivery of the goods in controversy and the attendant transfer of title from Shetzline to Bangor imposed no duty of further payment to Shetzline upon Bangor. In these circumstances any claim the seller asserts against Bangor as alleged undisclosed principal of Shetzline is not strengthened by Bangor's receipt and use of the merchandise. Indeed, the majority of the American decisions hold that such good faith settlement by an undisclosed principal with his agent gives the principal a complete defense even against the third person who, on tardily discovering the principal's existence, establishes that the agent acted within the scope of his authority and asserts that the principal should bear the burden of the agent's authorized contract from which the principal has benefited. Fradley v. Hyland, C.C.N.Y.1888, 37 F. 49, 2 L.R.A. 749; Bush v. Devine, Del.1854, 5 Harr. 375;

Emerson v. Patch, 1878, 123 Mass. 541; Harder v. Continental Printing & P. C. Co., N.Y.1909, 64 Misc. 89, 117 N.Y.S. 1001; Southern R. Co. v. W. A. Simpkins Co., 1919, 178 N.C. 273, 100 S.E. 418, 10 A.L.R. 731. Contra: Willard v. Buckingham, 1870, 36 Conn. 395; York County Bank v. Stein, 1866, 24 Md. 447; Restatement, Agency, § 208. And see Note, collecting and discussing American and English cases on Liability of an Undisclosed Principal After Settlement with Agent, 18 Miss.L.J. 436. We need not decide which view represents the law of Pennsylvania, which governs this case. For even where the minority view prevails, we think the additional fact here that Bangor did not authorize the Senor-Shetzline sale would leave no room for doubt that Bangor's only duty with respect to the goods was that which it owed Shetzline as a result of the transactions between them and had satisfied before Senor made any claim.

There remains the claim that Bangor is liable on the check which Shetzline gave Senor in payment for the yarn. Shetzline had not left sufficient funds on deposit to cover this item. The check was drawn on a bank account which had been established with Bangor's money as the account of "Bangor Mills Incorporated or William H. Shetzline, Jr." with either party authorized to draw on it. The check in suit had been drawn by Shetzline and signed "William H. Shetzline, Jr.," but with the further printed identification of the drawer on the face of the check as "William H. Shetzline, Jr., Division." It is undisputed that the bank had authorized the use of this style to distinguish this account from a private account standing in Shetzline's name.

These facts are relevant despite the general rule that an undisclosed principal is not liable as a party to a negotiable instrument. Restatement, Agency § 192. For under Section 18 of the Negotiable Instruments Law, 56 P. S. § 23, "one who signs [a negotiable instrument] in a trade or assumed name" is liable thereon. And it is appellant's

theory that "William H. Shetzline, Jr. Division" is an assumed or trade name of Bangor Mills. The court, however, found that this was not the fact. And in the circumstances already outlined we think it was a reasonable and proper conclusion that "William H. Shetzline, Jr., Division" was a name designating Shetzline and not an assumed or trade name of Bangor.

The judgment will be affirmed.