T.C. Memo. 2013-222

UNITED STATES TAX COURT

LARRY ZAVADIL AND DIANE ZAVADIL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17403-10.                    Filed September 19, 2013.

<u>Joseph A. Nilan</u> and <u>Joshua A. Dorothy</u>, for petitioners.

<u>Blaine C. Holiday</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined the following deficiencies in

petitioners' Federal income tax and section 6662(a)[1] accuracy-related penalties:

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code (Code) in effect for the years in issue, and all Rule references are to

(continued...)

| **[*2]** | | Penalty |
| Year | Deficiency | sec. 6662(a) |
| 2004 | $163,806 | $32,761 |
| 2005 | 130,126 | 26,025 |

After concessions, the issues for decision are: (1) whether petitioners are entitled to charitable contribution deductions in excess of the $218,355 and $202,059 that respondent allowed for 2004 and 2005, respectively; (2) whether petitioners substantiated nonpassive, unreimbursed expenses of $185,800 and $75,000 that they claimed on their Schedules E, Supplemental Income and Loss, attached to their Forms 1040, U.S. Individual Income Tax Return, for 2004 and 2005,

---

[1](...continued)
the Tax Court Rules of Practice and Procedure. Monetary amounts have been rounded to the nearest dollar.

[*3] respectively;[2] and (3) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 2004 and 2005.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. Petitioners resided in Minnesota when they petitioned this Court.

I.   Background

A.   American Solutions for Business

Mr. Zavadil organized American Business Forms, Inc. (ABF), in February 1981. ABF is a subchapter S corporation organized under Minnesota law that did

---

[2]Respondent disallowed unreimbursed expenses of $220,684 and $165,259 that petitioners claimed on Schedules E attached to their Forms 1040 for 2004 and 2005, respectively. The unreimbursed expenses originally at issue were as follows:

| Description | 2004 | 2005 |
|---|---|---|
| Travel expenses | $32,184 | $90,259 |
| Payments to Becky DePree | 38,500 | -0- |
| Payments to NBD&F | 150,000 | 75,000 |
| Total | 220,684 | 165,259 |

Petitioners concede that (1) they are unable to substantiate their claimed travel expenses and (2) Ms. DePree received $35,800 in 2004 and not $38,500 . Accordingly, the unreimbursed expenses remaining at issue are the $35,800 paid to Ms. DePree in 2004 and the $150,000 and $75,000 paid to NBD&F in 2004 and 2005, respectively.

**[*4]** business during the years in issue as American Solutions for Business (ASB).[3] Mr. Zavadil was ASB's sole shareholder until June 27, 2000. On that date Mr. Zavadil sold all of the outstanding shares of ASB to ASB's newly formed employee stock ownership plan (ESOP). In exchange for his shares of ASB Mr. Zavadil received a $28,760,000 note from ASB, payable with interest in 20 consecutive annual installments. After the sale of his ASB shares Mr. Zavadil continued to serve without compensation on ASB's board of directors and as its CEO.

In 2000 ASB's board of directors consisted of Mr. Zavadil, Curt Briggs, and Joseph A. Nilan (petitioners' counsel in this case). Mr. Briggs was also the president of National Business Development & Finance (NBD&F) during the years in issue. After the formation of the ESOP, and at the request of Wells Fargo, Jeff Seidel joined ASB's board of directors.

### B. American Diversity Business Solutions

Diane Zavadil organized American Minority Business Forms, Inc. (AMBF) in June 1992. AMBF is a subchapter S corporation that did business during the

---

[3]Although the corporation's official name is American Business Forms, Inc., the parties and witnesses consistently referred to the corporation by its trade name, American Solutions for Business, and we do the same.

[*5] years in issue as American Diversity Business Solutions (ADBS). Mrs. Zavadil was the sole shareholder of ADBS during the years in issue.

### C. Zavadil Development

Mr. Zavadil organized Zavadil Development, Inc., a subchapter S corporation, in January 2000. Mr. Zavadil was the sole shareholder of Zavadil Development during the years in issue.

### D. Account No. 5458

During 2004 and part of 2005 Mr. Zavadil maintained a checking account with an account number ending in 5458 (account No. 5458) at Glenwood State Bank in the name of "Larry Zavadil Expense Account". Before April 2005 the checks written on account No. 5458 stated: "Zavadil Sales Company, Larry Zavadil Expense Account". At some time in April 2005, the checks written on account No. 5458 stated: "Larry Zavadil Expense Account". In November or December 2005 Mr. Zavadil changed the name on account No. 5458 to "Zavadil Development, Inc., Expense Account Larry Zavadil".

## II. Mr. Zavadil's ASB Ledger Account

ASB maintained a ledger account on its books to keep track of Mr. Zavadil's non-ASB expenditures. The ledger account was maintained by Marci Henke, an ASB employee. To generate a ledger entry either Mr. Zavadil would

**[*6]** instruct Ms. Henke to ask ASB's finance department to issue a check for a non-ASB item or he would charge a non-ASB item to his ASB credit card. Mr. Zavadil would then instruct Ms. Henke or his executive assistant, Gladys Freese, to charge the item back to his ASB ledger account.

During the years in issue Ms. Henke and/or Ms. Freese charged various non-ASB expenses to Mr. Zavadil's ASB ledger account. Included in those charges were the following: (1) various charitable contributions; (2) monthly payments to Becky DePree, the former wife of a longtime ASB employee, the late Dusty DePree; (3) monthly payments to NBD&F; and (4) advances to account No. 5458.

ASB's creditors required ASB to ensure that all salesperson ledger accounts were paid off each month, and Mr. Zavadil accordingly wrote checks drawn on account No. 5458 to pay off his ledger at the end of each month.[4] However, at the end of several months during the years in issue Mr. Zavadil had insufficient funds in account No. 5458 to clear the checks drawn on that account. In those months Mr. Zavadil caused ASB to (1) transfer sufficient funds from ASB to account No. 5458 to cover the check (or checks) drawn on account No. 5458; (2) record the

---

[4]On several occasions Mr. Zavadil also wrote checks drawn on account No. 5458 to pay off part of his ASB ledger account balance in the middle of the month.

[*7] charge on his ASB ledger account; and (3) then cash the check (or checks) drawn on account No. 5458.

The following table shows (1) the balance of Mr. Zavadil's ASB ledger account before the check (or checks) drawn on account No. 5458 was (or were) credited to it at the end of the month; (2) the amount of the check (or checks) drawn on account No. 5458; and (3) the amount that ASB advanced to account No. 5458 and recorded on Mr. Zavadil's ASB ledger account after the payment amount was credited to Mr. Zavadil's ASB ledger account and on or before the date that the check (or checks) drawn on account No. 5458 cleared:

| Month | Ending balance of ASB ledger account | Amount of check(s) drawn on account No. 5458 | Amount advanced before check(s) cleared |
|---|---|---|---|
| | | 2004 | |
| January | $194,146 | $170,000 | -0- |
| February | 319,051 | 319,051 | $150,000 |
| March | 736,253 | 736,253 | -0- |
| April | 431,943 | 431,343 | 400,000 |
| May | 1,244,386 | 1,244,386 | -0- |
| June | 500,994 | 500,994 | -0- |
| July | 709,507 | 709,507 | -0- |
| August | 384,676 | 384,676 | 87,000 |
| September | 438,756 | 437,406 | -0- |
| October | 928,756 | 927,084 | -0- |
| November | 162,131 | 162,131 | 142,000 |
| December | 621,137 | 621,137 | -0- |

**[*8]** <u>2005</u>

| | | | |
|---|---|---|---|
| January | 883,810 | 883,810 | -0- |
| February | 758,089 | 758,089 | 500,000 |
| March | 391,678 | 391,678 | -0- |
| April | 909,035 | 909,035 | 373,000 |
| May | 1,139,012 | 1,139,012 | 180,000 |
| June | 1,134,978 | 1,134,978 | -0- |
| July | 1,429,372 | 1,429,372 | 587,000 |
| August | 1,428,517 | 1,428,517 | 62,000 |
| September | 1,258,723 | 1,258,723 | 1,371,000 |
| October | 1,579,358 | 1,579,358 | 1,302,000 |
| November | 1,813,757 | 1,813,757 | 1,800,000 |
| December | 1,508,316 | 1,508,316 | Unknown[1] |

[1]The record does not contain a copy of Mr. Zavadil's ledger account for any month after December 2005. However, the bank statements for account No. 5458 show a deposit of $1,610,000 on Jan. 3, 2006.

III.     Petitioners' Tax Reporting

Petitioners reported adjusted gross income of $3,613,063 and $3,074,750 on their Forms 1040 for 2004 and 2005, respectively. They claimed charitable contribution deductions of $576,827 and $535,731 on the Schedules A, Itemized Deductions, attached to their Forms 1040 for 2004 and 2005, respectively.

On statements attached to their 2004 and 2005 Forms 1040 petitioners listed their Schedule A charitable contribution deductions as follows:

| [*9] Description | Amount |
|---|---|

### 2004

| | |
|---|---|
| Church of the Sacred Heart | $53,000 |
| St. Mary's | 11,667 |
| Various--ledger | 494,562 |
| Diocese of St. Cloud | 12,000 |
| Various | 1,487 |
| From K-1--AMBF | 4,111 |
| Total for 2004 | 576,827 |

### 2005

| | |
|---|---|
| Church of the Sacred Heart | 29,000 |
| Church of the Sacred Heart | 21,000 |
| St. Mary's | 30,100 |
| Habitat for Humanity | 5,000 |
| Various--ledger | 411,934 |
| Miscellaneous | 418 |
| Public TV | 249 |
| Guthrie Theatre | 9,792 |
| Ellis Island | 21,500 |
| MPLS Inst. of Arts | 3,000 |
| NIAF | 2,000 |
| From K-1--AMBF | 1,738 |
| Total for 2005 | 535,731 |

Petitioners also attached Schedules E to their 2004 and 2005 Forms 1040. On a statement attached to their 2004 Form 1040 petitioners reported nonpassive losses of $220,684 for "unreimbursed expenses" relating to AMBF. On a statement attached to their 2005 Form 1040 petitioners reported nonpassive losses

**[*10]** of $75,000 and $90,259 for "unreimbursed expenses" relating to AMBF and Zavadil Development, respectively.

## OPINION

### I. Burden of Proof

Generally, the taxpayer bears the burden of proving that he is entitled to any claimed deduction. See Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). This includes the burden of substantiation. Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), (e), Income Tax Regs. If, however, a taxpayer produces credible evidence[5] with respect to any factual issue relevant to ascertaining the taxpayer's tax liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the

---

[5] "'Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness).'" Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

**[*11]** Secretary[6] for witnesses, information, documents, meetings, and interviews. See also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

The parties do not discuss the applicability of section 7491(a)(1) to this case, and we cannot determine from the record whether petitioners met the requirements of section 7491(a)(2). Accordingly, the burden of proof remains on petitioners.

## II. Charitable Contribution Deductions

### A. Charitable Contributions Generally

Generally, section 170(a) allows a deduction for any charitable contribution made by a taxpayer. A charitable contribution may be effected through the efforts of an agent acting for the donor. See Skripak v. Commissioner, 84 T.C. 285, 318 (1985); Weitz v. Commissioner, T.C. Memo. 1989-99, 56 T.C.M. (CCH) 1422, 1426-1427 (1989). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." 1 Restatement, Agency

---

[6]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[*12]** 3d, sec. 1.01 (2006); see also Senor v. Bangor Mills, Inc., 211 F.2d 685, 688 (3d Cir. 1954); Weitz v. Commissioner, 56 T.C.M. (CCH) at 1427.

Deductions for charitable contributions of money are subject to the recordkeeping requirements of section 1.170A-13(a), Income Tax Regs.  For contributions of $250 or more, the taxpayer must also substantiate the contribution with a contemporaneous written acknowledgment from the donee organization.[7] Sec. 170(f)(8)(A); sec. 1.170A-13(f)(1), Income Tax Regs.

Section 170(f)(8)(B) provides as follows with respect to the content of the required contemporaneous written acknowledgment:

> (B) Content of acknowledgment.--An acknowledgment meets the requirements of this subparagraph if it includes the following information:
>
> (i) The amount of cash and a description (but not value) of any property other than cash contributed.
>
> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).
>
> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) or, if such goods

---

[7]Separate contributions of less than $250 are not subject to the requirements of sec. 170(f)(8), regardless of whether the contributions made by a taxpayer to a donee organization during a taxable year total $250 or more.  Sec. 1.170A-13(f)(1), Income Tax Regs.

**[*13]** or services consist solely of intangible religious benefits, a statement to that effect.

B.  Charitable Contributions at Issue

Respondent disallowed charitable contribution deductions of $358,472 and $333,672 for 2004 and 2005, respectively.  Petitioners conceded that they are not entitled to some of the claimed charitable contribution deductions.  However, the parties disagree with respect to (1) whether petitioners are bound by certain monetary concessions in the petition and (2) whether certain of the claimed charitable contributions should be disallowed for reasons that are unrelated to the parties' primary dispute.  The parties contend that the charitable deductions properly at issue are as follows:

|  | 2004 | 2005 |
|---|---|---|
| Per petitioners | $222,675 | $165,219 |
| Per respondent | 217,514 | 150,045 |

1.  Whether Petitioners Are Bound by Amounts They Conceded in the Petition

Respondent contends that petitioners conceded in their petition that they are not entitled to $140,958 and $183,627 of the claimed charitable contribution deductions for 2004 and 2005, respectively.[8]  Accordingly, respondent contends

---

[8]In their petition, petitioners concede that (1) they received value in
(continued...)

[*14] that only $217,514 and $150,045 of the claimed charitable contribution deductions for 2004 and 2005, respectively, are at issue.

Petitioners contend that respondent will not be prejudiced if we disregard the monetary amounts of the concessions set forth in the petition because they are challenging respondent's deficiency determinations only with respect to the charitable contribution deductions that respondent determined to be the charitable contributions of ASB.

Respondent did not explain in the notice of deficiency his reasons for disallowing the charitable contribution deductions. Petitioners in their petition attempted to quantify the amounts at issue. In doing so petitioners made it clear that they were contesting respondent's determinations only with respect to the charitable contributions that respondent disallowed because he determined that they were the charitable contributions of ASB. Respondent does not contend that he previously allowed any of the contributions that petitioners listed in their summary of contributions at issue or that he in any way relied on petitioners' concessions in preparing this case for trial. We find that respondent will not be

_____

[8](...continued)
exchange for $32,744 and $36,579 of the disallowed contributions for 2004 and 2005, respectively; and (2) they failed to substantiate $108,215 and $147,048 of the disallowed contributions for 2004 and 2005, respectively.

[*15] prejudiced by our consideration of all of the charitable contribution deductions that were disallowed for the reason identified in the petition, and we conclude therefore that with the exception of certain contributions discussed below, see infra part II.B.2, all such contributions are properly at issue.[9]

### 2. Whether Additional Disputed Amounts Are at Issue

Petitioners introduced summary exhibits purporting to list charitable contribution deductions at issue of $237,305 and $171,572 for 2004 and 2005, respectively. At trial petitioners conceded the following adjustments to their summary exhibits:[10]

_____

[9]We note, however, that upon realizing that they erroneously conceded certain amounts in the petition, petitioners should have moved to amend the petition pursuant to Rule 41(a).

[10]Petitioners disavow on brief three additional concessions that they made at trial: First, petitioners conceded that the second receipt on page 483 of Exhibit 22-J shows that the deductible amount was less than the gift amount. Petitioners now contend that this receipt was dated December 31, 2003, and was therefore not included in their summary of charitable contributions at issue for 2004. Second, petitioners conceded that the second receipt on page 525 of Exhibit 22-J shows that the deductible amount was less than the gift amount. Petitioners now contend that they included the deductible amount for this contribution only in their summary of charitable contributions at issue for 2004. Third, petitioners conceded that the receipt on page 768 of Exhibit 22-J shows that the deductible amount was less than the gift amount. Petitioners now contend that they included the deductible amount for this contribution only in their summary of charitable contributions at issue for 2005. We agree with petitioners that these concessions were erroneous and that therefore no adjustments to the amounts at issue are

(continued...)

| [*16] Date | Donee | Original claimed amount | Corrected claimed amount | Net correction |
|---|---|---|---|---|
| 2/12/04 | St. Anthony Med. Ctr. | $834 | [1]$1,834 | $1,000 |
| 4/13/04 | Guthrie | 3,500 | 3,456 | (44) |
| 5/21/04 | Univ. of Minn. Found. (UMF) | 3,900 | 3,120 | (780) |
| 5/21/04 | UMF | 2,600 | 2,080 | (520) |
| Net correction for 2004 | | | | (344) |
| | | | | |
| 5/20/05 | Nat'l Ethnic Coal. of Orgs. Found. | 25,000 | 21,500 | (3,500) |
| 11/25/05 | Guthrie | 10,000 | 9,792 | (208) |
| Net correction for 2005 | | | | (3,708) |

[1]$1,000 was charged to Mr. Zavadil's ledger on Feb. 12, 2004, and $834 was charged to his ledger on Sept. 23, 2004.

In their reply brief petitioners concede that they are not entitled to deduct additional contributions because either (1) the corresponding receipts lacked the required section 170(f)(8) statement or (2) the contributions were not charged to Mr. Zavadil's ASB ledger account. Petitioners' concessions are as follows:

[10](...continued)
required on account of these concessions.

| [*17] Date | Donee | Amount |
|---|---|---|

### Receipts missing sec. 170(f)(8) statement

| Date | Donee | Amount |
|---|---|---|
| 2/12/04 | Girl Scout Troop 630 | $500 |
| 3/10/04 | Nat'l Wild Turkey Fed'n | 250 |
| 3/14/04 | First Baptist Church of Glenwood | 500 |
| 4/19/04 | Terrace Mill Found. | 250 |
| 5/24/04 | Minnewaska Lake Ass'n | 500 |
| 12/13/04 | Armful of Love | 12,000 |
| Total for 2004 | | 14,000 |
| 1/11/05 | United Way of Douglas & Pope Cntys. | 1,200 |
| 2/22/05 | Pioneer Pub. TV | 250 |
| 5/5/05 | United Way of Douglas & Pope Cntys. | 345 |
| 11/25/05 | Pioneer Pub. TV | 250 |
| Total for 2005 | | 2,045 |

### Contributions not charged to ledger account

| Date | Donee | Amount |
|---|---|---|
| 1/2/04 | Am. Cancer Soc'y (ACS) | 225 |
| 6/14/04 | Nat'l Child Safety Council | 61 |
| Total for 2004 | | 286 |
| 9/20/05 | Nw. Minn. Found. | [1]100 |
| 12/17/05 | Ann & Andy Preschool | 500 |
| Total for 2005 | | 600 |

[1]In fact, this contribution was charged to Mr. Zavadil's ASB ledger account on the date stated in petitioners' summary of contributions at issue.

[*18] Petitioners' contentions with respect to the amounts of charitable contributions at issue for 2004 and 2005, respectively, can be summarized as follows:

|  | 2004 | 2005 |
|---|---|---|
| Petitioners' summary of charitable contributions at issue | $237,305 | $171,572 |
| Petitioners' concessions at trial | (344) | (3,708) |
| Missing sec. 170(f)(8) statement | (14,000) | (2,045) |
| Contributions not charged to ledger account | (286) | (600) |
| Petitioners' final claimed contributions at issue | 222,675 | 165,219 |

Respondent contends that additional contributions are not properly at issue because either (1) the receipts for the contributions lacked the required section 170(f)(8) statement or (2) the contributions were not charged to Mr. Zavadil's ASB ledger account. The contributions that respondent contends are not properly at issue but not conceded by petitioners are as follows:

| Date | Donee | Amount |
|---|---|---|
| Receipts missing sec. 170(f)(8) statement | | |
| 5/21/04 | Minnewaska High School | $166 |
| 11/22/04 | Norgaard Elementary | 145 |
| Total for 2004 | | 311 |
| 3/24/05 | Hospice | 59 |
| 3/24/05 | Norgaard Elementary | 33 |
| 4/22/05 | Norgaard Elementary | 33 |
| Total for 2005 | | 125 |

[*19] Contributions not charged to ledger account

| | | |
|---|---|---:|
| 3/30/04 | UMF | 237 |
| 5/21/04 | UMF | [1]406 |
| 5/21/04 | UMF | [2]3,120 |
| 5/21/04 | UMF | [3]2,080 |
| 6/4/04 | ACS | [4]800 |
| 6/15/04 | ACS | [5]250 |
| 6/22/04 | UMF | 52 |
| 6/24/04 | UMF | [6]30,000 |
| 6/24/04 | UMF | [6]40,000 |
| 8/3/04 | ACS | [7]525 |
| 8/4/04 | UMF | [8]1,500 |
| 12/13/04 | UMF | 80 |
| Total for 2004 | | 79,050 |
| | | |
| 6/16/05 | UMF | [9]2,000 |
| 7/20/05 | ACS | 50 |
| 7/20/05 | ACS | 50 |
| 10/18/05 | UMF | 160 |
| Total for 2005 | | 2,260 |

[1]The receipt that petitioners introduced for this contribution recognizes a contribution of $106.

[2]Petitioners concede that they are not entitled to deduct the full $3,900 payment to UMF that they claimed on their summary of contributions at issue. See supra part II.B.2.

[3]Petitioners concede that they are not entitled to deduct the full $2,600 payment to UMF that they claimed on their summary of contributions at issue. See supra part II.B.2.

[4]The receipt that petitioners introduced for this contribution recognizes a contribution in memory of Helen Hustad, Ida Ronnei, Dale McLain, Susanne Lauer, Richard Frederick, John Arneson, Howard Elwood, and Clara Cummins. We find that contributions in their memory were recorded as having occurred on Mr. Zavadil's ASB ledger account on May 17, 2004, each in the amount of $100.

**[\*20]** [5]The receipt that petitioners introduced for this contribution recognizes a contribution from Zavadil Sales Co. that occurred on June 15, 2004. Zavadil Sales is not an incorporated entity. See infra part II.C.2. We find that Mr. Zavadil made this contribution directly from his own funds.

[6]The receipts that petitioners introduced for this contribution recognize contributions made by credit card. We find that these contributions were recorded on Mr. Zavadil's ASB ledger account as having occurred on July 22, 2004, when ASB paid off the $70,000 credit card bill.

[7]The receipt that petitioners introduced for this contribution recognizes a contribution in memory of Norval Lund, Lyle Anderson, Mable Evenson, Elvera Neros, Julian Nygaard, Mary Hvezda, James Berg, Gerald Wold, and Ken Helgeson. We find that contributions in their memory were recorded on Mr. Zavadil's ASB ledger account as having occurred on July 6 or 14, 2004, in the amounts of $50, $100, $25, $25, $100, $100, $25, and $50, respectively.

[8]The receipt that petitioners introduced for this contribution recognizes a contribution of $1,100 and is dated Aug. 4, 2004. This contribution was recorded on Mr. Zavadil's ASB ledger account as having occurred on May 3, 2004, in the amount of $1,500.

[9]Petitioners' summary of contributions combined the claimed charitable contribution deduction for this contribution with that of a second contribution to UMF and claimed a total charitable contribution deduction for both contributions of $6,843. The receipt that petitioners introduced for this contribution recognizes a contribution of $2,000, states that only $1,600 of the contribution is deductible, and is dated June 16, 2005. The receipt for the second contribution recognizes a contribution of $10,000, states that $5,243 of the contribution is deductible, and is dated June 15, 2005. We find that these contributions were recorded on Mr. Zavadil's ASB ledger account as having occurred on June 16, 2005, in the amount of $12,000.

With respect to the contribution receipts that respondent contends lack the required section 170(f)(8) statement, we note that the contributions covered by

[*21] those receipts were for less than $250. Accordingly, section 170(f)(8)

statements were not required, see sec. 170(f)(8)(A); sec. 1.170A-13(f)(1), Income

Tax Regs., and these contributions are therefore properly at issue.

With respect to the contributions that respondent contends were not charged

to Mr. Zavadil's ASB ledger account, we find that only the following

contributions were not charged to the ledger account:

| Date | Donee | Amount |
|------|-------|--------|
| 3/30/04 | UMF | $237 |
| 5/21/04 | UMF | [1]406 |
| 6/22/04 | UMF | 52 |
| 12/13/04 | UMF | 80 |
| Total for 2004 | | 775 |
| | | |
| 10/18/05 | UMF | 160 |
| Total for 2005 | | 160 |

[1]As noted supra p. 19, the receipt for this contribution recognizes a contribution of only $106.

Petitioners contend that these contributions were not charged to Mr.

Zavadil's ASB ledger account because they were paid by ASB in cash, rather than

by check or credit card. Petitioners have not introduced any evidence to support

their contention that Mr. Zavadil bore the economic burden of the cash

contributions. Accordingly, we find that petitioners are not entitled to a deduction

for these contributions. See Rule 142(a)(1).

**[*22]** C.   Charitable Contributions Charged to Mr. Zavadil's ASB Ledger Account

Petitioners contend that they properly deducted the charitable contributions at issue because Mr. Zavadil bore the economic burden of the charitable contributions that were charged to his ASB ledger account and therefore ASB paid the amounts in question as Mr. Zavadil's agent.  Respondent contends that (1) ASB, and not Mr. Zavadil, bore the economic burden of the charitable contributions; (2) even if ASB did not bear the economic burden of the charitable contributions, Zavadil Development, and not Mr. Zavadil, bore that burden; and (3) petitioners did not show that ASB acted as an agent of Mr. Zavadil.

1.   Whether ASB Bore the Economic Burden of the Charitable Contributions

Respondent contends that ASB bore the economic burden of the charitable contributions at issue because Mr. Zavadil used a circular flow of funds to ensure that he did not bear the economic burden of the contributions.  In particular, respondent contends that Mr. Zavadil would regularly (1) issue checks from account No. 5458 at the end of the month to pay off his ledger; (2) advance sufficient funds from ASB to account No. 5458 at the beginning of the next month to cover the check drawn on account No. 5458; and then (3) cause ASB to cash the check from account No. 5458.  For example, Mr. Zavadil's ASB ledger account

[*23] shows that an outstanding balance of $1,813,757 was paid with a check from account No. 5458 on November 30, 2005.[11]  The ledger account further shows that ASB advanced $1,800,000 to Mr. Zavadil on December 5, 2005.  The bank statement for account No. 5458 reflects a deposit of $1,800,000 on December 5, 2005.  The bank statement for account No. 5458 further shows that $1,813,757 (check No. 16743) was debited from the account on December 5, 2005.

Respondent's argument is too broad and fails to recognize that Mr. Zavadil at certain times during the years at issue fully paid his ASB ledger account balances with his own funds.  The record shows that the alleged circular flow of funds of which respondent complains did not become a regular pattern until the second half of 2005.  Moreover, the record shows that Mr. Zavadil paid his ASB ledger account balances as of December 31, 2004, and June 30, 2005, without the benefit of any advances from ASB to cover the payments.  Because Mr. Zavadil's ASB ledger account balances were fully paid off at the end of December 2004 and June 2005 without an advance to cover those months' payments, any previous advances were necessarily paid off.  Accordingly, we conclude that ASB did not bear the economic burden of the charitable contributions charged to Mr. Zavadil's ASB ledger account before July 2005.

---

[11]The ledger entry states "CREDIT PMT. BY PERS. CK#16743".

**[\*24]**  We reach a different conclusion, however, with respect to the charitable contributions made from Mr. Zavadil's ASB ledger account after June 2005.  From July 2005 through at least November 2005 Mr. Zavadil caused ASB to advance funds to account No. 5458 to cover the checks drawn on that account to pay off his ASB ledger balance for those months.[12]  This circular flow of funds resulted in ASB's assumption of most, if not all, of the economic burden of the charitable contributions charged to Mr. Zavadil's ASB ledger account after June 2005.

Petitioners failed to prove what portion, if any, of the charitable contributions made after June 2005 Mr. Zavadil effectively paid with his own funds and not funds advanced by ASB.  Petitioners also introduced no credible evidence that Mr. Zavadil's ASB ledger account balance at the end of 2005 represented bona fide indebtedness of Mr. Zavadil.  We therefore conclude that petitioners have failed to carry their burden of showing that Mr. Zavadil, and not ASB, bore the economic burden of the charitable contributions at issue that were made after June 2005.  See Rule 142(a)(1).

---

[12]The record does not show whether ASB advanced funds to account No. 5458 to cover the $1,508,316 check drawn on that account to pay off his ASB ledger at the end of December 2005.  However, the bank statements for account No. 5458 show that a deposit of $1,610,000 was made to that account on the day that the check cleared.

**[\*25]**     2.     <u>Whether Zavadil Development Bore the Economic Burden of the Charitable Contributions</u>

Respondent contends that even if we find that ASB did not bear the economic burden of the charitable contributions at issue, Zavadil Development, and not Mr. Zavadil, bore that burden because Mr. Zavadil paid off the balance of his ASB ledger account from an account of Zavadil Development.

Respondent's contention is based on his assertion that account No. 5458 was owned by Zavadil Development. However, the parties stipulated that account No. 5458 was a "Zavadil Sales Company account", and Mr. Zavadil and Colette Carlson, a certified public accountant who has prepared petitioners' tax returns since the early 1990s, both credibly testified that account No. 5458 was Mr. Zavadil's business account for his unincorporated sales activities that he first started using in 1981, if not earlier.[13] Moreover, the name appearing on the bank statements for account No. 5458 does not include Zavadil Development until at least November or December 2005. And although Mr. Zavadil testified that he

---

[13]As Mr. Zavadil noted at trial, the check numbers for account No. 5458 corroborate his testimony that the account has been in use for a long time. Check No. 14113 was drawn on account No. 5458 on January 20, 2004. Check No. 16888 was drawn on account No. 5458 on January 5, 2006. During this roughly two-year period, Mr. Zavadil wrote 2,775 checks against account No. 5458, or around 1,387 per year. Mr. Zavadil formed Zavadil Development in January 2000, and it is unlikely that Mr. Zavadil wrote 14,112 checks during the four years between January 2000 and January 2004.

**[*26]** used some of the funds that he deposited into account No. 5458 to fund Zavadil Development's real estate investments, there is nothing in the record that contradicts the parties' stipulation and Mr. Zavadil and Ms. Carlson's testimony that account No. 5458 was an account of Zavadil Sales. Zavadil Sales is not an incorporated entity. We therefore find that Mr. Zavadil, and not Zavadil Development, bore the economic burden of the charitable contributions charged to his ASB ledger account before July 2005.

### 3. Whether ASB Was Mr. Zavadil's Agent

Respondent contends that petitioners have not shown that ASB acted as Mr. Zavadil's agent in making the charitable contributions at issue. Respondent notes that although an agency relationship does not require a written agreement, see PMH Props. v. Nichols, 263 N.W.2d 799, 803 (Minn. 1978), there still must be evidence that the agent assented to the undertaking, see id. However, Mr. Zavadil credibly testified that he directed ASB employees to make the charitable contributions on his behalf. Moreover, Mr. Zavadil's testimony was corroborated by the testimony of Ms. Freese and Ms. Carlson and by the introduction of the ledger itself into evidence. We infer that, as CEO of ASB, Mr. Zavadil could

**[*27]** cause ASB to assent to being his agent in making the charitable contributions at issue.[14]

Respondent further contends that this case is distinguishable from cases such as Skripak v. Commissioner, 84 T.C. at 318, and Weitz v. Commissioner, 56 T.C.M. (CCH) at 1426-1427, where we held that charitable contributions can be effected through an agent of the taxpayer, because the agents in those cases contributed the principals' assets whereas ASB contributed its own money and not Mr. Zavadil's money. But by agreeing to act as Mr. Zavadil's agent in making the charitable contributions at issue, ASB also agreed to advance the contributed amounts to Mr. Zavadil. We therefore find that ASB acted as an agent of Mr. Zavadil when it made the charitable contributions at issue. Accordingly, we (1) conclude that petitioners are entitled to deduct the charitable contributions at issue that were charged to Mr. Zavadil's ASB ledger account before July 2005 and (2) sustain respondent's disallowance of the charitable contribution deductions at

---

[14]Respondent points to the fact that ASB was recognized as a 10-year member of the Minnesota Keystone Program for donating at least 2% of its pretax earnings to charity. "The Minnesota Keystone Program is a program of the Minneapolis Regional Chamber of Commerce." http://www.minneapolischamber.org/clientuploads/docs/2011/KeystoneInsert_Ov erview.pdf (last visited July 2, 2013). We do not think that ASB's participation in this private program is particularly useful in deciding whether ASB was acting as an agent of Mr. Zavadil when it made the charitable contributions at issue.

[*28] issue that were charged to Mr. Zavadil's ASB ledger account after June 2005.

III.    Unreimbursed Expenses

Respondent disallowed the unreimbursed expenses of $220,684 and $165,259 that petitioners claimed on the Schedules E attached to their Forms 1040 for 2004 and 2005, respectively.  After concessions, the unreimbursed expenses remaining at issue are the $35,800 paid to Ms. DePree in 2004 and the $150,000 and $75,000 paid to NBD&F in 2004 and 2005, respectively.[15]

A.    Section 162(a) Generally

Section 162(a) provides a deduction for ordinary and necessary expenses that a taxpayer pays or incurs during the taxable year in carrying on a trade or business.  Section 162(a) requires a taxpayer to prove that the expenses deducted (1) were paid or incurred during the taxable year, (2) were incurred to carry on the taxpayer's trade or business, and (3) were ordinary and necessary expenditures of the business.  See also Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971).  An expense is ordinary if it is customary or usual within a

_____

[15]Because we sustain respondent's disallowance of the unreimbursed expenses at issue for the reasons discussed below, we need not address respondent's alternative contention that ASB or Zavadil Development bore the economic burden of these expenses, and not Mr. Zavadil.

[*29] particular trade, business, or industry or relates to a transaction "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business. See Commissioner v. Heininger, 320 U.S. 467, 471 (1943).

Generally, a taxpayer who pays another taxpayer's business expenses may not treat those payments as ordinary and necessary expenses incurred in the payor's business. See Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815 (1964); see also Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593-594 (1943); Deputy v. du Pont, 308 U.S. at 494-495; S. Am. Gold & Platinum Co. v. Commissioner, 8 T.C. 1297, 1301-1302 (1947), aff'd, 168 F.2d 71 (2d Cir. 1948). However, where a taxpayer pays the ordinary and necessary business expenses of another taxpayer in order to protect or promote the payor's own business, the payment may be deductible. See, e.g., Scruggs--Vandervoort--Barney, Inc. v. Commissioner, 7 T.C. 779, 787 (1946); Moloney Elec. Co. v. Commissioner, 42 B.T.A. 78, 83 (1940), aff'd in part, rev'd in part on another issue, 120 F.2d 617 (8th Cir. 1941); First Nat'l Bank of Skowhegan, Me. v. Commissioner, 35 B.T.A. 876, 884-885 (1937). In Lohrke v. Commissioner, 48 T.C. 679, 688 (1967), we articulated a two-part test for determining whether a taxpayer's payments are

[*30] eligible for this exception: (1) the taxpayer's primary motive for paying the expenses was to protect or promote the taxpayer's business and (2) the expenditures constituted ordinary and necessary expenses in the furtherance or promotion of the taxpayer's business.

### B. Payments to Ms. DePree

Petitioners contend that they can deduct $35,800 that Mr. Zavadil charged to his ASB ledger account in 2004 for payments to Ms. DePree because the payments satisfied an obligation of ASB that it refused to pay. Additionally, petitioners contend that ASB would have been allowed to deduct the payments to Ms. DePree had it made the payments itself because ASB originally agreed to make the payments on account of Mr. DePree's long and valuable service to ASB.

The payments to Ms. DePree were recorded on Mr. Zavadil's ASB ledger account. Mr. Zavadil testified that, after Mr. DePree died in 1999, he promised to pay Ms. DePree $250,000 over five years to provide additional compensation for Mr. DePree's hard, and often undercompensated, work for ASB during its early years.[16] Mr. Zavadil further testified that, when the ESOP acquired the

---

[16]We note that, in a statement attached to petitioners' 2004 Form 1040, petitioners reported that the unreimbursed expenses at issue for 2004, including the payments to Ms. DePree, were attributable to unreimbursed expenses of AMBF. To explain this discrepancy, petitioners called their return preparer, Ms.

(continued...)

[*31] outstanding shares of ASB, the ESOP declined to continue making payments to Ms. DePree because ASB's board of directors (board) concluded that (1) the payments to Ms. DePree were the personal obligations of Mr. Zavadil and (2) it would be better if the ESOP were not burdened with these payment because the ESOP already carried significant debt.

Petitioners contend that they disagreed with the board's decision to terminate ASB's payments to Ms. DePree and that, therefore, Mr. Zavadil was simply paying Ms. DePree what ASB had previously agreed to pay her. Petitioners further contend that Mr. Zavadil continued paying Ms. DePree to protect his reputation as a salesperson. However, Mr. Zavadil did not testify that he continued paying Ms. DePree because he was concerned about his business reputation, and there is no factual basis in the record to support a finding that Mr. Zavadil made the payments to protect his reputation.

We conclude that petitioners have failed to satisfy the first part of Lohrke's two-part test. See Rule 142(a)(1); Lohrke v. Commissioner, 48 T.C. at 688.

---

16(...continued)
Carlson, to testify at trial. Ms. Carlson testified that she originally understood from her conversations with Mr. Zavadil that the payments were deductible because Ms. DePree provided consulting services to AMBF. Petitioners did not call Ms. DePree to testify at trial as to the nature of the payments she received.

[*32] Accordingly, we sustain respondent's disallowance of the unreimbursed expense deduction petitioners claimed for the amount paid to Ms. DePree in 2004.

### C.    Payments to NBD&F

Petitioners contend that they can deduct $150,000 and $75,000 charged to Mr. Zavadil's ASB ledger account in 2004 and 2005, respectively, for payments to NBD&F because the payments were compensation for services actually rendered to Mr. Zavadil's various wholly owned business entities.

NBD&F was Mr. Briggs' consulting company. The payments to NBD&F were recorded on Mr. Zavadil's ASB ledger account. Mr. Zavadil testified that Mr. Briggs mostly provided consulting services for entities belonging to Mr. or Mrs. Zavadil, and therefore the payments to Mr. Briggs were charged to his ASB ledger account. Mr. Zavadil further testified that Mr. Briggs was a member of ASB's board of directors when the ESOP was formed in 2000.

We infer from Mr. Zavadil's vague testimony that Mr. Briggs provided some services to ASB during the years in issue. Mr. Zavadil, however, did not call Mr. Briggs to testify as to the nature of the payments NBD&F received and he did not otherwise introduce any credible evidence about the nature of the payments. Petitioners do not contend, and have introduced no credible evidence showing, that Mr. Zavadil paid ASB's NBD&F consulting expenses to protect or promote

**[\*33]** his other business activities.  See Lohrke v. Commissioner, 48 T.C. at 688.

Because petitioners have failed to introduce any credible evidence regarding the

nature and purpose of the payments at issue, we sustain respondent's disallowance

of the unreimbursed expenses that petitioners claimed for the amounts paid to

NBD&F in 2004 and 2005, respectively.

IV.    Accuracy-Related Penalty Under Section 6662(a)

Section 6662(a) and (b)(1) and (2) authorizes the Commissioner to impose a

20% penalty on an underpayment of tax that is attributable to, among other things,

(1) negligence or disregard of rules or regulations or (2) any substantial

understatement of income tax.  Only one section 6662 accuracy-related penalty

may be imposed with respect to any given portion of an underpayment.  New

Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 Fed.

Appx. 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

The term "negligence" includes any failure to make a reasonable attempt to

comply with the provisions of the internal revenue laws, and the term "disregard"

includes any careless, reckless, or intentional disregard.  Sec. 6662(c); sec. 1.6662-

3(b)(1) and (2), Income Tax Regs.  "'Negligence' also includes any failure by the

taxpayer to keep adequate books and records or to substantiate items properly."

Sec. 1.6662-3(b)(1), Income Tax Regs.  Disregard of rules or regulations "is

[*34] 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe."  Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Nis Family Trust v. Commissioner, 115 T.C. 523, 542 (2000).  An understatement means the excess of the amount of tax required to be shown on a return over the amount of the tax imposed which is shown on the return, reduced by any rebate.  Sec. 6662(d)(2)(A).  An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  An understatement is substantial in the case of a corporation if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $10,000.  Sec. 6662(d)(1)(B).

The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that there was reasonable cause and that he or she acted in good faith.  Sec. 6664(c)(1).  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances.  See sec.

**[\*35]** 1.6664-4(b)(1), Income Tax Regs. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. See Higbee v. Commissioner, 116 T.C. at 447.

We have sustained, or petitioners have conceded, certain of respondent's adjustments to petitioners' claimed charitable contribution and unreimbursed business expense deductions for 2004 and 2005. The evidence shows that petitioners did not comply with the rules and regulations under sections 162 and 170 in claiming these deductions. Respondent has therefore met his burden of producing evidence showing that a section 6662(a) penalty for an underpayment of tax attributable to negligence or disregard of rules or regulations with respect to

[*36] the disallowed deductions is appropriate. Petitioners have not shown that such a penalty is inappropriate, and they do not contend that they acted with reasonable cause and in good faith with respect to the underpayment. Accordingly, petitioners are liable for a section 6662(a) penalty for an underpayment of tax attributable to negligence or disregard of rules or regulations.

Alternatively, to the extent that the Rule 155 computations show that the understatement of tax for 2004 or 2005 exceeds the greater of 10% of the tax required to be shown on the return or $5,000, see sec. 6662(d)(1)(A), respondent has met his burden of producing evidence showing that a section 6662(a) penalty for an underpayment of tax attributable to a substantial understatement of income tax is appropriate. Petitioners do not contend that they acted with reasonable cause and in good faith with respect to the underpayments. Accordingly, petitioners would be liable for a section 6662(a) penalty for an underpayment of tax attributable to a substantial understatement of tax for such year or years. However, petitioners will be liable for only one section 6662(a) penalty with respect to any portion of the underpayment of tax.

**[*37]**  We have considered the parties' remaining arguments, and to the extent not

discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.